JOSHUA S. STAMBAUGH (SBN 233834)
josh@frostllp.com
NICO L. BRANCOLINI (SBN 318237)
nico@frostllp.com
WILLIAM H. DANCE (SBN 230041)
bdance@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Plaintiff
MARK BIANCHI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MARK BIANCHI, an individual, | Case No. 2:25-cv-09741 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **1. Defamation Per Se** |
| | **2. Defamation Per Quod** |
| GEOFFREY DIETRICH, an individual; RIKIN PATEL, an individual; DAN KING, an individual; CHRISTOPHER MARSTON, an individual; EMERSON FAMILY OFFICE, a Delaware limited liability company; and DOES 1 through 100, inclusive, | **3. Trade Libel / Commercial Disparagement** |
| | **4. Intentional Interference with Prospective Economic Advantage** |
| | **5. Negligent Interference with Prospective Economic Advantage** |
| Defendants. | **6. Conspiracy to Defame** |
| | **DEMAND FOR TRIAL BY JURY** |

Plaintiff Mark Bianchi ("Bianchi"), for his complaint against defendants Geoffrey Dietrich ("Dietrich"), Rikin Patel ("Patel"), Dan King ("King"), Christopher Marston ("Marston"), Emerson Family Office, and DOES 1 through 100 (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.    In Imperial Rome, complex disputes often turned to the blunt inquiry: *cui bono*—who benefits? Today, in the sophisticated world of charitable investments, that ancient question illuminates a conspiracy as old as commerce itself: when honest competition proves too difficult, destroy the competitor.

2.    The charitable partnership investment industry occupies a complex niche in financial services. These structures allow high-net-worth individuals to make charitable contributions through pass-through entities while claiming tax deductions: legitimate when properly executed, but scrutinized heavily by the IRS for potential abuse. Success in this specialized field depends entirely on reputation, trust, and strict compliance with intricate tax regulations.

3.    This case exposes how four business associates—Dietrich, Patel, King, and Marston, each of whom had previously worked with Bianchi in related ventures—orchestrated a calculated defamation campaign against their former colleague. In 2024, Bianchi had been in partnership with Dietrich and Patel developing tax mitigation strategies through charitable partnerships, while King and Marston were professional collaborators in overlapping ventures. By November 2024, after that partnership ended through a mutually agreed walk-away, Bianchi went his own way to develop new offerings. That is when Defendants abandoned fair competition in favor of a campaign of character assassination.

4.    The conspiracy unfolded with military precision. Within weeks of Bianchi's departure, the Defendants each began spreading identical lies: Bianchi was a "criminal" who created "fraudulent tax write-offs" and "fake K-1s," an addict with "drug problems" and "gambling problems," a thief who had "stolen" their business

model. From private phone calls to public conferences, they contaminated the investment community's view of Bianchi with calculated falsehoods.

5.    Like Marc Antony over Julius's fresh corpse—"I come to bury Caesar, not to praise him"—Defendants feigned moral outrage to justify the character assassination of their former colleague. As set forth in detail below, Defendants falsely told financial advisors in the industry that Bianchi had "drug problems" and engaged in "criminal" behavior. At conferences, Defendants falsely told numerous third parties their former partner had "stolen" from them.

6.    In the financial services industry, reputation is everything. Trust is the only currency that matters. Accusing a professional of fraud and forgery can be career-ending. Defendants knew this. When Patel made moves to secure a large payday he revealed what lay beneath Defendants' crocodile tears: rather than face Bianchi in the market, they chose to bury him in lies.

7.    *Cui bono*? The Defendants' defamation campaign against Bianchi had an obvious motive and goal. As competitors of Bianchi in the same industry, the Defendants' goal was to destroy Bianchi's reputation among existing and potential clients, as well as existing and prospective partners and advisors, and then divert those clients and partners to themselves for their own financial benefit.

8.    This lawsuit seeks accountability for Defendants' choices of defamation, conspiracy and malice. The ancient question—who benefits?—yields a modern answer: Defendants profited from every lie told, every relationship poisoned, and every opportunity stolen through slander rather than earned through excellence.

## THE PARTIES

9.    Plaintiff Mark Bianchi ("Bianchi") is, and at all relevant times mentioned herein was, an individual domiciled in and a citizen of the State of Tennessee.

10.    Defendant Geoffrey Dietrich ("Dietrich") is, and at all relevant times mentioned herein was, an individual domiciled in and a citizen of the State of Texas.

11.    Defendant Rikin Patel ("Patel") is, and at all relevant times mentioned

herein was, an individual domiciled in and a citizen of the State of New Jersey.

12.     Defendant Dan King ("King") is, and at all relevant times mentioned herein was, an individual domiciled in and a citizen of the State of California.

13.     Defendant Christopher Marston ("Marston") is, and at all relevant times mentioned herein was, an individual domiciled in and a citizen of the State of California.

14.     Defendant Emerson Family Office is, on information and belief, a limited liability company organized under the laws of Delaware with its principal place of business in New York.

15.     Plaintiff is informed and believes, and on that basis alleges, that, Defendants DOES 1 through 100, inclusive, are individually and/or jointly liable to Plaintiff for the conduct alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff at this time. Accordingly, Plaintiff sue Defendants DOES 1 through 100, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities once ascertained.

16.     As set forth in detail below, at all relevant times mentioned herein, Defendants, and each of them, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all acting within the course and scope of the agency of and/or employment by the others, each and all acting in concert one with the other and all together.

17.     As set forth in detail below, at all relevant times mentioned herein, Defendants, and each of them, were, and are, the agents, servants, alter egos and/or employees of each of the other Defendants, and all the things alleged to have been done by Defendants were done in the capacity of and as agent, servant, alter ego and/or employee of and for the other Defendants, with their knowledge approval, and ratification.

## JURISDICTION AND VENUE

18.   This Court has jurisdiction over Plaintiff's claims under and pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Plaintiff and Defendants, and the amount in controversy far exceeds $75,000, exclusive of interests and costs. Plaintiff Mark Bianchi is a citizen of the State of Tennessee. Plaintiff is informed and believes, and on that basis alleges, that none of the Defendants are citizens of the State of Tennessee.

19.   This Court has personal jurisdiction over each Defendant because each Defendant either resides in the State of California or purposefully directed tortious conduct to California and this District, and Plaintiff's claims arise out of or relate to Defendants' forum-related conduct and activities.

20.   This Court has general jurisdiction over Defendant Dan King because he resides in the State of California. Independently, this Court has specific jurisdiction over Defendant King because he maintains his business office in this District and committed tortious acts within and aimed at the State of California, including by publishing defamatory statements from within this District, and Plaintiff's claims arise out of and relate to Defendant King's forum-related conduct and activities.

21.   This Court has general jurisdiction over Defendant Christopher Marston because he resides in the State of California. Independently, this Court has specific jurisdiction over Defendant Marston because he purposefully directed defamatory statements at and interference of Plaintiff's California relationships, and Plaintiff's claims arise out of or relate to Defendant Marston's forum-related conduct and activities.

22.   This Court has specific jurisdiction over Defendant Geoffrey Dietrich because he purposefully directed tortious conduct at California and this District, including by publishing defamatory statements to industry participants who conduct business in California and by targeting Plaintiff's California relationships with knowledge that his conduct would cause harm here. Dietrich regularly transacts

business with California advisors, firms, and residents, and has derived substantial revenue from California in connection with his offerings and relationships, thus further supporting the exercise of specific jurisdiction.

23.     This Court has specific jurisdiction over Defendant Rikin Patel because he purposefully directed activities at California by acting as a principal of the Emerson Family Office, a business entity that regularly conducts business in California. In that role, Patel exercised control over and derived substantial benefit from Emerson Family Office's California-based operations, including from transactions for offerings processed through California operations and sold to California residents. Furthermore, Patel purposefully directed tortious conduct at California and this District, including by publishing defamatory statements to industry participants who conduct business in California and by targeting Plaintiff's California relationships with knowledge that his conduct would cause harm here, thus further supporting the exercise of specific jurisdiction.

24.     This Court has personal jurisdiction over Emerson Family Office by virtue of its maintaining two offices in the State of California, transacting and doing business in the State of California and this District, and by its facilitation or authorization of, and conspiracy with, the Defendants in the California-focused publication of defamatory statements and interference with Plaintiff's California relationships, such that Plaintiff's claims arise out of and relate to that forum-related conduct. Accordingly, this Court has specific jurisdiction over Emerson Family Office in connection with this action, and, independently, Emerson Family Office's contacts with the State of California are so continuous and systematic as to render it subject to general jurisdiction.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including the dissemination of defamatory statements to industry participants here and the disruption of Plaintiff's relationships within this District.

FROST

## GENERAL ALLEGATIONS

**The Parties' Business Relationship and Expertise**

26.    Plaintiff Bianchi is an accomplished entrepreneur with extensive experience in the charitable partnership financial structures industry. These sophisticated investment vehicles allow high-net-worth individuals to make charitable contributions through pass-through entities while obtaining tax benefits consistent with the Internal Revenue Code. Given the highly regulated nature of the industry, Bianchi's reputation for integrity, diligence, and compliance is essential to his trade.

27.    Defendant Dietrich is a tax attorney who owns and controls Solidaris Capital, LLC ("Solidaris") and Cirrus Investments, LLC ("Cirrus"). Dietrich has marketed himself as an expert in tax mitigation strategies, though as events would reveal, his expertise relied heavily on the knowledge and relationships of others, particularly Bianchi.

28.    Prior to working with Bianchi, Dietrich was a relatively small-time sponsor in the industry. However, between 2022 and 2023, Dietrich and Bianchi worked together on numerous offerings.

29.    In 2024, Bianchi further collaborated with Dietrich and they—along with Patel—developed and marketed charitable partnership investment structures. Bianchi and Patel were particularly talented at developing and implementing tax mitigation strategies, a highly attractive service and product class for financial advisors to offer their high-net-worth clients.

30.    The parties' 2024 partnership initially focused on developing what became known as the Tech2Head Offering, a charitable partnership structure that sought to distinguish itself from controversial tax shelters through legitimate business practices, including independent appraisals, fiduciary transparency, escrow safeguards, and arms-length transactions.

31.    Tax mitigation products like the Tech2Head Offering tend to become particularly popular each year around Q4, when investors have clarity on their annual

tax liabilities and seek mitigation strategies. Bianchi was instrumental in developing these structures, securing technology partnerships, and maintaining relationships with financial advisors who would offer the investments to their clients.

32.    During this collaboration, Bianchi worked closely with Dietrich and Patel. Bianchi and Patel built programs together and became integral to the operation, helping Dietrich learn how to properly sell these products and scale the business through major wealth management firms. Through one of those companies, Kingswood U.S., they also worked with King.

33.    Bianchi's son, Cristian, worked as an administrative assistant to Patel during this time, giving the Defendants intimate knowledge of Bianchi's family relationships which they would later exploit in their defamation campaign.

34.    By October 2024, the business relationship between Dietrich, Patel, and Bianchi had deteriorated. The group had been providing various products through a major wealth management firm when Bianchi left the group.

35.    Following the deterioration of the relationship, Defendants Patel and Dietrich lured financial advisors away from the major wealth management firm and prevented that firm from continuing to use the products, thereby cutting off the firm's access to the offerings that Bianchi had helped develop.

36.    On November 7-8, 2024, Bianchi (through his involvement with Head Genetics, Inc.) and Dietrich's entity Solidaris Capital, LLC executed a comprehensive Confidential Termination Agreement ("Termination Agreement"), after which Bianchi was then free to pursue his own business ventures in the charitable partnership space, which he proceeded to do in late 2024.

**Texas Litigation – Limited Scope**

37.    On December 13, 2024, Dietrich's affiliates filed suit against Bianchi and Head Genetics in Texas state court seeking to challenge Bianchi's business activities.

38.    The Texas court entered temporary restraining orders on December 18,

2024, and February 5, 2025. Critically, these orders were: (a) entered subject to Head Genetics's special appearance contesting jurisdiction; (b) limited to restricting use of three specific documents from the 2024 offering; and (c) explicitly non-adjudicative, with no findings of wrongdoing or liability, and by their own terms effective only on a temporary basis pending the hearing on a preliminary injunction.

39.    The Texas orders did not prohibit Bianchi from conducting business, developing new offerings, or working with new partners. They certainly did not declare Bianchi a criminal or validate any of Defendants' defamatory statements.

**Bianchi's Legitimate 2024 Business Activities**

40.    In late 2024, Bianchi began developing a new charitable partnership, CRP Offering, that was materially different from his prior work with Dietrich.

41.    Bianchi's new offering reflected evolution in the industry and his own innovations, utilizing gift cards for medical devices rather than software licenses, implementing stronger escrow protections, and ensuring better alignment with charitable purposes. At the same time, the underlying charitable deduction laws and regulations and related tax mitigation strategies—with which Bianchi was fully familiar for years before meeting Dietrich—are matters over which Dietrich could obviously not claim any trade secret protection.

**The Defamation Campaign Begins**

42.    Beginning in November 2024, Defendants executed their conspiracy through a calculated pattern of false and defamatory statements specifically designed to destroy Bianchi's business reputation and relationships.

43.    Plaintiff Bianchi and Defendants Patel and Dietrich had worked with Kingswood U.S.—a national wealth management firm—on various offerings. In late November or early December 2024, following Bianchi's walk-away from the group, senior representatives at Kingswood inquired about his departure. Defendant Patel responded by stating that Bianchi was a "junkie" who had "drinking" and "drug problems" that caused allegedly erratic behavior. In that same conversation, Patel

further claimed that Bianchi was a "backstabber" who had "stolen" Dietrich's financial products and was "risky to work with."

44.  These statements were false. Bianchi does not have drug or alcohol problems, did not steal any financial products or models from Dietrich (or anyone), and is not "risky to work with."

45.  These statements were particularly damaging because they were made in the context of the financial services industry, where professionals must maintain good character and integrity, and where substance abuse would disqualify someone from responsibly handling client assets. Patel made these statements knowing they would spread through the close-knit wealth management community.

46.  Additional information later revealed that Patel was plotting with Dietrich to obtain a large payday and was angling to divert advisors to sell their products exclusively, preventing these advisors from working with competing offerings from Bianchi. The defamation campaign was designed to ensure advisors would not consider Bianchi's superior 2024 offerings.

47.  On or about November 25, 2024, during a phone call on with Bobby Hotaling, a risk-management professional, Defendant Patel stated of Bianchi that "Mark has a drinking problem, drug problem, [and] gambling problem," and that "Mark Bianchi is a f*cking criminal—a piece of sh*t." When discussing why Bianchi's son, Cristian, was no longer working with his father, Patel added: "If Mark was such a good guy, why would his son be working for us?"

48.  Patel's statements to Hotaling are categorically false. Bianchi has never had any issue with alcohol or drugs, has never been convicted of any crime, and has never engaged in the conduct Patel described.

49.  Patel made these statements in his capacity as someone who had worked directly with Bianchi and would have insider knowledge, lending a false air of credibility to his lies. Patel knew his statements were false; he worked closely with Bianchi throughout 2024 without ever witnessing or reporting any substance abuse

issues or criminal behavior.

50.    During 2024, Defendant Marston attempted to organize a new offering for Bianchi but failed to deliver it within the timetable he had originally represented. Marston finally reached out to Bianchi in November 2024; however, by then Bianchi had already pursued an offering on his own. Upon learning this, Marston retaliated by contacting Bianchi's clients and referral sources in an effort to divert them away from him. Acting on insider knowledge obtained through his collusion with Dietrich, Marston told industry participants that a then-imminent temporary restraining order ("TRO") would shut Bianchi down, urging them to cease doing business with him.

51.    Marston furthered the smear campaign by disparaging Bianchi to key actors in the industry, including executives at Alivint Group and Kingswood, referring to Bianchi as an "alcoholic" or "drinker" and as someone engaged in unlawful conduct. These statements were false. Bianchi does not have alcohol or substance-abuse issues, has not engaged in unlawful conduct, and no TRO has ever "shut down" his operations. Not only were Marston's statements false; they were specifically calculated to disrupt Bianchi's relationships. In fact, as detailed below, the Texas TROs were limited, non-adjudicative, and did not prohibit Bianchi from operating or developing new offerings.

**Dietrich's Public Defamation Campaign**

52.    In February 2025, Dietrich escalated the conspiracy by making false statements to approximately 50 industry professionals at a Solidaris conference in Cabo San Lucas, Mexico. As the conference's host, Dietrich used his position of authority to maximize the impact of his defamation.

53.    Dietrich told the audience about litigation with his "ex-partner," identifying Bianchi by name, and then stated "Mark is uneducated" and that "Mark took the business model and went his own way."

54.    The clear implication was that Bianchi had stolen intellectual property— a particularly damaging accusation in an industry based on trust. The claim or

implication that Bianchi had stolen intellectual property was categorically false; Bianchi has never engaged in the theft of intellectual property.

55. The timing of Dietrich's statements further suggests that he was trying to get ahead of a pending FINRA investigation and used the opportunity to paint a false picture of Mark before the audience could learn the truth. This evidences Dietrich's consciousness of wrongdoing and intent to prejudice the industry against Bianchi.

56. As set forth below, Dietrich went on to make additional false statements impugning Bianchi's honesty and lawfulness, and he coordinated with Marston and King to circulate these themes while attempting to divert clients away from Bianchi.

57. On or about December 3, 2024, Bianchi's colleague Janna Scott—Chief Financial Officer of Precision Strategy Consulting—received a phone call from financial advisor Andrew Urbanski, who relayed the same false statements Dietrich had been circulating about Bianchi. Urbanski insisted that Dietrich had informed him that Bianchi was "a liar, a scammer, and someone not to be trusted under any circumstances." Urbanski's statements—conveying information from Dietrich—were categorically false. Bianchi has never been a liar, a scammer, or a person not to be trusted under any circumstances. Although Urbanski had previously assured Bianchi of his continued business, he ultimately severed ties. Urbanski's decision to terminate the relationship alone resulted in the loss of at least $6 million in expected business.

**King's Targeted Attacks on Business Relationships**

58. On or about late July 23, 2025, an affiliate of the Emerson Family Office introduced Johnson Emerson to Defendant Dan King, Managing Director of the firm's Los Angeles office. Johnson Emerson, along with an associate who does not personally know Bianchi, then participated in a Zoom call with King.

59. During this Zoom call, King offered services similar to those provided by Bianchi. When Emerson mentioned that he had a professional relationship with

Bianchi, King immediately launched into an unprovoked and vicious attack on Bianchi's character and business practices, declaring Bianchi a "criminal" who had "created fraudulent tax write-offs," "falsified K-1s and PPMs," and was "not taking actual deductions." King further accused Bianchi of "stealing clients" from Defendants, portraying Bianchi as a thief who had wrongfully taken business that belonged to Defendants.

60.    King then invoked Bianchi's family relationships—including his son, Cristian—to further attack Bianchi. King claimed that Cristian "does not work for Mark, but for [me] and Geoff [Dietrich] because Mark is a bad guy." This false statement was particularly malicious because King knew it would imply that even Bianchi's own son had abandoned him due to the improper and illegal conduct of which King falsely accused Bianchi.

61.    The above defamatory statements were all unequivocally false. In fact, Bianchi never created any false tax write-offs and he never falsified any documents. Instead, these false accusations were made with the intent of discouraging Johnson Emerson from doing business with Bianchi.

62.    Then, on May 28, 2025, King targeted Bianchi's prospective business relationship with Nano Genesis Labs, a nanotechnology healthcare company. King called CEO Ugo Amobi specifically to interfere with their pending transaction, stating that Amobi should not trust Bianchi, advising that his attorneys investigate Bianchi, and insisting that Bianchi "tanked and took Head Genetics out of business." King's statements to Amobi were categorically false. Bianchi did not "tank" and did not take Head Genetics out of business. Shortly after the call, King sent a follow-up text: "Don't say I didn't worn [sic] you. He prays [sic] on the desperate."

/ / /

/ / /

/ / /

/ / /

63.     On or about July 23, 2025, King sent Bianchi a text message acknowledging that his statements to third parties caused Bianchi to lose business relationships.

64.     On May 30, 2025, Defendant King also made substantially similar defamatory statements to Caden Gunnell, President of Sales and Product Development at Strategic Associates. During a call that Gunnell contemporaneously described to Plaintiff, King falsely accused Bianchi of criminality and disparaged his business integrity. Gunnell memorialized that King had "slander[ed] [Bianchi's] name … big time," repeating the same false accusations the Defendants had circulated elsewhere. These statements mirrored those King had made to other industry professionals about Bianchi and further demonstrate the coordinated nature of the conspiracy.

65.     These statements were false. Bianchi did not engage in criminality, did not falsify documents, and conducted his business lawfully.

**The Written Interference Campaign - From Defamation to Disruption**

66.     Having verbally defamed Bianchi throughout the industry, Defendants escalated to written threats designed to interfere with Bianchi's specific business relationships.

67.     On May 30, 2025, Defendants caused their attorney to send a letter to Nano Genesis Labs which falsely asserted that Bianchi was "not legally permitted" to carry out transactions and insisted that working with Bianchi would constitute

"tortious interference" as Bianchi possessed stolen "trade secrets," and even claimed that Nano Genesis would face liability for working with Bianchi.

68.    This letter was knowingly false. The limited Texas restraining orders did not prohibit Bianchi from conducting new business. Defendants knew that tax strategies cannot constitute trade secrets as a matter of law.

69.    The letter was designed to intimidate Nano Genesis Labs into abandoning its relationship with Bianchi through threats of litigation, a classic form of intentional interference with prospective economic advantage.

**The Conspiracy's Success – Damaged Relationships and Lost Business**

70.    Defendants' conspiracy achieved its intended effect. Their coordinated campaign of defamation and interference: caused financial advisors to doubt working with Bianchi; spread false narratives throughout the small, interconnected industry; and forced Bianchi to spend time and resources defending his reputation and his business against false accusations.

71.    The campaign was particularly effective. Defendants were perceived as industry insiders with credible information. Their accusations targeted the precise concerns of financial professionals—fraud, compliance, and character—and, when circulated by multiple speakers and reinforced by attorneys' written threats, they carried an appearance of truth.

72.    Defendants acted with actual malice and the specific intent to destroy Bianchi's business and reputation. All Defendants are sophisticated business professionals who understood the impact of their words. They knew their statements were false, having worked closely with Bianchi. Dietrich deliberately chose a public forum to maximize damage. And King even admitted he was "totally out of line" and needed to "set the record straight."

73.    Taken together, this record evidences agreement and coordination. All Defendants honed in on similar themes (allegations of crime, theft, and substance abuse—all of which were untrue). Specific business relationships were targeted. And

the Defendants timed their attacks to maximize their impact on Bianchi as he launched his new product.

74. As a direct and proximate result of Defendants' conspiracy and wrongful acts, Bianchi has suffered: loss of relationships with financial advisors who heard the defamation; damage to reputation in the specialized charitable partnership industry; lost profits from business opportunities destroyed by Defendants; costs of responding to false accusations and threats, as well as the emotional distress from coordinated attacks on his character.

75. Indeed, the damages are ongoing as Defendants' false statements continue to circulate throughout the industry, requiring constant efforts by Bianchi to rehabilitate his wrongfully tarnished reputation.

76. Defendants' conduct was despicable, done with willful and conscious disregard of Bianchi's rights, and intended to destroy his livelihood, entitling Bianchi to punitive damages.

## **FIRST CAUSE OF ACTION**

### **(Defamation Per Se - Against all Defendants)**

77. Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

78. The statements made by Defendants, as set forth herein, constitute defamation per se because they charge Bianchi with criminal conduct, accuse him of conduct incompatible with his profession, and impute characteristics that would damage Bianchi in his trade and business.

**Patel's Defamatory Statements**

79. In or about November or December 2024, Defendant Patel made defamatory statements about Bianchi during a conversation with a financial advisor at a wealth management firm that had previously done business with the group that included Dietrich, Patel, and Bianchi.

80. When asked by representatives at Kingswood as to why Bianchi was no

longer working with the group, Patel stated that Bianchi was a "junkie" with "drinking" and "drug problems," and a "backstabber" who had "stolen" products and was "risky to work with." On November 25, 2024, during a separate telephone conversation with Hotaling, a financial advisor who worked with both Patel and Bianchi, Patel stated: "Mark Bianchi is a f*cking criminal" and a "piece of sh*t," further stating "if Mark was such a good guy, why would his son be working for us?"

81.    These statements charge Bianchi with criminal conduct ("criminal"), accuse him of characteristics incompatible with the practice of his profession (substance abuse in financial services), and impute characteristics that would damage him in his trade (unreliability, criminal behavior, addiction).

82.    Patel's statements were false; Bianchi has never been convicted of any crime, does not have substance abuse problems, and did not engage in any of the conduct the Defendants have falsely accused him of.

**Dietrich's Defamatory Statements**

83.    In or about February 2025, Defendant Dietrich made false and defamatory statements about Bianchi at a Solidaris-hosted conference in Cabo San Lucas before an audience of approximately fifty financial services professionals.

84.    During his presentation, Dietrich identified Bianchi by name as his "ex-partner" involved in litigation and declared: "Mark is uneducated," and that he "took the business model and went his own way."

85.    The clear and unambiguous meaning of Dietrich's statements, particularly in the context of announced litigation, was that Bianchi had stolen intellectual property and was a thief who misappropriated business assets.

86.    These statements charge Bianchi with theft and dishonesty, which constitute crimes involving moral turpitude that would disqualify him from working in financial services and damage his professional reputation.

87.    The statements were false. Bianchi did not steal any business model, and Dietrich knew this. Bianchi is highly educated in his field with extensive experience

in charitable partnership structures.

88.     Dietrich spread these defamatory themes to professionals closely affiliated with Bianchi. Specifically, on a December 3, 2024 phone call including Urbanski, a long-time referral source told Bianchi's associate Janna Scott that Dietrich insisted to Urbanski that Bianchi was "a liar, a scammer, and someone not to be trusted under any circumstances." All of Dietrich's claims are categorically false. Bianchi is not a liar, a scammer, or untrustworthy. Shortly thereafter, Urbanski had transferred his business dealings away from Bianchi and toward Dietrich.

**King's Defamatory Statements**

89.     On or about July 23, 2025, Defendant King made false and defamatory statements about Bianchi during a Zoom conference call with Johnson Emerson and his associate. Upon learning that Emerson had a relationship with Bianchi, King stated "Mark Bianchi is a criminal" who created "fraudulent tax write-offs," "fake K-1 forms," "fake Private Placement Memorandums," and was "not taking actual deductions"; in sum, "Mark is a bad guy" who "stole clients." All of King's statements are categorically false. Bianchi did not engage in criminality, did not falsify documents, and conducted his business lawfully.

90.     In or about May 2025, King made similar false statements to Ugo Amobi, CEO of Nano Genesis Labs, stating: don't trust Bianchi, have your attorneys investigate him, insisting Bianchi "tanked and took Head Genetics out of business," and then wrote in a follow-up text message: "Don't say I didn't worn [sic] you. He prays [sic] on the desperate."

91.     These statements explicitly charge Bianchi with criminal conduct (fraud, forgery, theft), accuse him of acts that would result in criminal prosecution, and falsely portray him as a predator who victimizes vulnerable people.

92.     The statements were false. Bianchi maintains proper business practices and has never created fraudulent tax documents or been charged with or convicted of fraud, and did not "steal" from Defendants.

**Marston's Defamatory Statements**

93.    On or about December 12, 2024, Marston made false statements about Bianchi to third parties in the industry, including to Strategic's Roger Roundy and Caden Gunnell, declaring that Bianchi had substance abuse issues, engaged in unlawful activity, and intimating that a TRO would shut down Bianchi's operations while urging recipients to move their business to Marston.

94.    These false statements were designed to charge Bianchi as someone engaged in criminal or unprofessional conduct and impute traits incompatible with his trade.

**Publication and Damages**

95.    Defendants published their defamatory statements to third parties in the financial services industry, including financial advisors, wealth management professionals, technology partners, and potential business associates of Bianchi.

96.    The statements were made with actual malice. Having worked closely with Bianchi and knowing his actual character and business practices, Defendants knew their statements were false. Alternatively, Defendants made the statements with reckless disregard for their truth.

97.    No privilege applies to Defendants' statements, which were made outside any judicial proceeding, without good faith, and with malice.

98.    Because the statements constitute defamation per se, damage to Bianchi's reputation is presumed. Additionally, Bianchi has suffered actual damages including loss of business opportunities and relationships; damage to his professional reputation in the financial services industry; mental suffering, shame, and hurt feelings; and ever-growing costs of defending against false accusations.

99.    Defendants' conduct was despicable and done with a willful and conscious disregard of Bianchi's rights, constituting malice, oppression, and fraud under Civil Code section 3294, thus entitling Bianchi to punitive damages.

## SECOND CAUSE OF ACTION

### (Defamation Per Quod - Against all Defendants)

100.  Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

101.  In addition to the statements constituting defamation per se, Defendants made false statements of fact about Bianchi that, while not defamatory on their face, are defamatory when considered with extrinsic facts and innuendo.

102.  On May 30, 2025, Defendants caused their attorney John A. Tancabel of Squire Patton Boggs LLP to send a letter to Ugo Amobi, Chief Executive Officer of Nano Genesis Labs, regarding Bianchi's pending business transaction.

103.  The letter stated that Bianchi was "bound by restrictive covenants that prevent him from carrying out a tax mitigation securities offering" and that "Mr. Bianchi is in possession of Cirrus and Solidaris's tax mitigation investment strategy trade secrets."

104.  The letter further stated: "Your continued participation in a tax mitigation securities offering with Mr. Bianchi would constitute tortious interference with Solidaris's contractual rights and would unlawfully misappropriate Cirrus and Solidaris's trade secrets."

105.  When considered with the extrinsic facts known to the recipients and the financial services community, they conveyed false factual assertions that Bianchi had violated valid legal restrictions, stolen confidential information, engaged in unlawful business conduct; and that any business partner working with Bianchi would face legal liability.

106.  The recipients of these communications understood the innuendo and implications based on their knowledge that, in this industry, violating restrictive covenants and misappropriating trade secrets can trigger regulatory scrutiny and enforcement, as well as other serious professional and contractual consequences. Likewise, professionals who knowingly work with someone violating legal

restrictions risk regulatory sanctions.

107.   These statements were false. Bianchi was not bound by any restrictive covenants limiting his lawful 2025 business activities. And tax mitigation strategies cannot constitute trade secrets as a matter of law.

108.   Defendants knew these statements were false or made them with reckless disregard for the truth, and published these statements to Nano Genesis Labs and, upon information and belief, to other potential business partners of Bianchi.

109.   As a direct and proximate result of these false statements, Bianchi suffered special damages including: damage to prospective business relationships; costs of legal representation to respond to the false accusations; and injury to his professional reputation requiring rehabilitation efforts.

110.   Defendants' conduct in making these false statements was intentional, malicious, oppressive, and fraudulent, entitling Bianchi to punitive damages under Civil Code section 3294.

### THIRD CAUSE OF ACTION

### (Trade Libel/Commercial Disparagement - Against All Defendants)

111.   Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

112.   At all relevant times, Bianchi operated a lawful business providing charitable partnership investment structures and related financial services to qualified investors through licensed financial advisors.

113.   Bianchi's business depends on his reputation for integrity, competence, and compliance with complex tax regulations. Trust is the foundation of relationships in the financial services industry.

114.   Defendants published false statements specifically disparaging the quality of Bianchi's services and business practices, including Defendant King's claims that Bianchi created "fraudulent tax write-offs"; produced "fake K-1 forms"; created "fake Private Placement Memorandums"; did "not tak[e] actual deductions";

"stole" the business model and clients; violated legal restrictions; misappropriated trade secrets; and that working with Bianchi would expose potential partners to legal liability.

115.    These false statements directly disparaged the integrity, quality, and legality of Bianchi's professional services, attacking the core of his business offering: legitimate, compliant, and innovative tax mitigation structures.

116.    The false statements were made to Bianchi's actual and prospective customers and business partners, including: financial advisors who sell charitable partnership investments; technology companies like Nano Genesis Labs who provide underlying assets; large-scale wealth management firms that offer such products to clients; and industry professionals at the Cabo San Lucas conference.

117.    Defendants knew their statements were false. Having worked closely with Bianchi, they knew Bianchi's offerings were legitimate and compliant; that he had never created fraudulent documents; the November 2024 Agreement released all claims; and that tax strategies cannot be classified as trade secrets.

118.    Defendants made their false statements with actual malice and with the specific intent to destroy Bianchi's business relationships, prevent financial advisors from offering Bianchi's products, intimidate technology partners from working with Bianchi, and eliminate Bianchi as a competitor.

119.    Bianchi suffered special damages as a direct result of Defendants' trade libel, including: loss of relationships with financial advisors who subsequently refused to work with him; decreased revenue from damaged business relationships; costs of rehabilitating his commercial reputation; and lost profits from business diverted to Defendants.

120.    These special damages were the natural and probable consequence of Defendants' false statements disparaging Bianchi's business, as Defendants knew that financial services professionals would not work with someone who falsified tax documents; technology partners would not associate with someone accused of theft

and fraud; and accusations of illegal conduct would destroy business relationships.

121.   Defendants' conduct was part of a coordinated campaign to destroy Bianchi's business through commercial disparagement, demonstrating malice, oppression, and fraud, thus entitling Bianchi to punitive damages under Civil Code section 3294.

## FOURTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage - Against All Defendants)

122.   Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

123.   Bianchi had existing economic relationships and reasonably probable future economic relationships with numerous parties in the financial services industry, including Nano Genesis Labs; financial advisors who previously worked with Bianchi; wealth management firms seeking tax mitigation products; and technology companies providing assets for charitable partnerships.

124.   Defendants knew of, and intended to disrupt, Bianchi's existing and prospective economic relationships because they had worked directly with him, observed his client and advisor relationships during their collaboration, understood—after the November 2024 Termination Agreement—that he would compete, and targeted specific relationships like Nano Genesis Labs.

///

125.   Defendants intentionally engaged in wrongful conduct designed to disrupt these relationships through defamatory statements made to Bianchi's business contacts; false claims of criminal conduct and fraud; threats of litigation against those who worked with Bianchi; and coordinated attacks on Bianchi's character and business practices.

126.   Among the economic relationships at issue was Bianchi's long-standing relationship with Andrew Urbanski. Defendants knew of this relationship and its

value to Bianchi's pipeline and utilized their defamation campaign to disrupt Bianchi's relationship with Urbanski, who subsequently transferred at least $6 million in business away from Bianchi and to Dietrich.

127.  Defendants' conduct was independently wrongful, qualifying as defamation per se; trade libel; threats of baseless litigation; and conspiracy to destroy a competitor through false statements.

128.  Defendants acted with the specific intent to interfere with Bianchi's business relationships, as evidenced by King calling Nano Genesis specifically to stop their transaction; Dietrich making false public statements to poison industry relationships; Patel targeting financial advisors who worked with Bianchi; and the coordinated timing coinciding with Bianchi's new business launch.

129.  Bianchi's economic relationships were actually disrupted. Nano Genesis Labs became hesitant to proceed after receiving threatening letters; financial advisors refused to work with Bianchi after hearing defamatory statements; Johnson Emerson was deterred from doing business with Bianchi; and potential partners at the Cabo San Lucas conference were prejudiced against Bianchi.

130.  As a proximate result of Defendants' intentional interference, Bianchi suffered damages including lost profits including approximating $6 million in referrals previously sourced through Andrew Urbanski, who left Bianchi and in turn, placed his business with Dietrich; lost relationships with financial advisors; decreased revenue from disrupted business relationships; costs of defending against false accusations; and ongoing harm to reputation.

131.  Defendants' interference was not privileged or justified, as they acted with malice; used unlawful means (defamation and threats); had no legitimate business purpose; and sought only to destroy their competition.

132.  Defendants' conduct was willful, malicious, oppressive, and fraudulent, entitling Bianchi to punitive damages under Civil Code section 3294.

# FIFTH CAUSE OF ACTION

## (Negligent Interference with Prospective Economic Advantage - Against All Defendants)

133.  Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

134.  Bianchi had existing and reasonably probable prospective economic relationships with third parties in the financial services industry, including financial advisors and wealth management firms that offered his products; longstanding referral sources like Andrew Urbanski; partners such as Nano Genesis Labs; and industry participants with whom Bianchi was actively developing offerings and relationships. Defendants knew of these relationships based on their prior work with Bianchi and their direct exposure to his pipeline.

135.  Defendants owed Bianchi a duty to exercise reasonable care to avoid causing foreseeable economic harm to Bianchi's existing and prospective business relationships, including the duty to refrain from negligently making or spreading false statements about Bianchi and his business practices, and the duty to verify the truth of any accusations before circulating them throughout the industry.

136.  Defendants breached that duty by, among other things, negligently circulating false statements accusing Bianchi of criminality, substance-abuse issues, and professional misconduct; by repeating and amplifying these false statements; and by sending or causing to be sent communications to Bianchi's counterparties—such as Ugo Amobi of Nano Genesis Labs—that improperly asserted legal restrictions and "trade secret" claims. Defendants knew or should have known that such statements were untrue and that their publication to Bianchi's counterparties would likely disrupt Bianchi's economic relationships.

137.  Defendants' negligent conduct proximately caused disruption to Bianchi's relationships, including advisors and wealth management firms who ceased or refused to work with Bianchi; the loss of at least $6 million in anticipated business

from Urbanski; hesitation and delay by Nano Genesis Labs following Defendants' communications; and additional lost opportunities with industry participants to whom the statements were published.

138.  As a direct and proximate result, Bianchi suffered economic harm, including lost profits, loss of business expectancy, reputation harm requiring remediation, and other consequential damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Conspiracy to Defame - Against all Defendants)

139.  Bianchi realleges and incorporates herein by reference all of the foregoing paragraphs, inclusive, as though fully set forth herein.

140.  Based on the facts alleged herein, Bianchi is informed and believes, and on that basis alleges, that in or about late 2024, following Bianchi's departure from their business group, Defendants Dietrich, Patel, and King formed an agreement to defame Bianchi and destroy his business reputation.

141.  Bianchi is informed and believes that such an agreement existed based on the following circumstances: all three Defendants began making false and defamatory statements about Bianchi immediately after the execution of the Termination Agreement; each Defendant used remarkably similar accusations including that Bianchi was a "criminal," had substance abuse problems, and had "stolen" from them; the statements escalated in coordination from private communications to public forums to written threats.

142.  Bianchi is further informed and believes that Defendants coordinated their defamatory campaign, as evidenced by King's remark to Johnson Emerson that Cristian Bianchi worked "for [them] because Mark is a bad guy" when, at the time Cristian was working with Patel, demonstrating communication between King, Patel, and Dietrich about Bianchi; Dietrich's statement at the conference suggest premeditation; and King's later admission that he was "totally out of line" and needed to "set the record straight," suggesting he recognized his participation in something

requiring correction.

143.    The timing and pattern of Defendants' conduct supports an inference of agreement, as Patel began defaming Bianchi to financial advisors immediately after the business relationship ended; Dietrich escalated the campaign at a public conference precisely when Bianchi was launching competing products; King targeted Bianchi's specific pending business transactions as they arose.

144.    Bianchi is informed and believes, and on that basis alleges, that Defendants agreed among themselves to accomplish their unlawful objectives of destroying Bianchi's business reputation through defamation; preventing financial advisors from working with Bianchi; and eliminating him as a competitor through unlawful means.

145.    In furtherance of the conspiracy, Defendants committed overt acts including Patel's defamatory statements to financial advisors in November or December 2024; Dietrich's public defamation at the February 2025 conference; King's defamatory statements to Johnson Emerson and Ugo Amobi; and the collective causing of the May 30, 2025 threatening letter to Nano Genesis Labs.

146.    On information and belief, at the time of the defamatory publications alleged herein, one or more individual Defendants were employed by or acting on behalf of Emerson Family Office and used the firm's resources and channels to disseminate the coordinated attacks against Bianchi. Emerson Family Office knowingly participated in, authorized, directed, encouraged, or ratified the conspiracy to defame Bianchi.

147.    Emerson Family Office knew or deliberately ignored the falsity of these statements, and nonetheless provided substantial assistance—including meeting access, introductions, and follow-up communications—to propagate and capitalize on the defamatory narrative for its own business advantage and for the advantage of its personnel.

148.    Marston knowingly joined and participated in the conspiracy. Acting in

concert with Dietrich, Patel, and King, Marston adopted and advanced the same defamatory themes—criminality, substance abuse, and regulatory non-compliance—and coordinated the timing and recipients of those messages to maximize harm to Bianchi's reputation and to divert business opportunities.

149.  Marston's participation is evidenced by his foreknowledge and dissemination of a then-imminent TRO against Bianchi before any such filing became public, which he invoked to tell industry participants that Bianchi would be "shut down," while simultaneously urging those participants to move their business to Marston. This mirrored and amplified Dietrich's and King's messaging and was calculated to disparage Bianchi's reputation.

150.  The conspiracy succeeded in its objectives, as Bianchi's reputation was damaged; business relationships were disrupted; and Bianchi was forced to defend against false accusations rather than focus on his own legitimate  business.

151.  As a direct and proximate result of the conspiracy, Bianchi suffered all damages previously alleged. Under conspiracy law, each Defendant is jointly and severally liable for all harm caused by any co-conspirator's acts in furtherance of the conspiracy.

152.  Bianchi is informed and believes that the conspiracy was formed and executed with malice, oppression, and fraud, entitling Bianchi to punitive damages under Civil Code section 3294.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Bianchi prays for judgment against Defendants, and each of them, as follows:

1.  For general, special, and consequential damages according to proof at trial;

2.  For loss of past and future earnings and earning capacity;

3.  For damages to business reputation and commercial relationships;

4.  For costs of rehabilitating Bianchi's wrongfully damaged reputation;

5.  For exemplary and punitive damages in an amount sufficient to punish Defendants and deter future misconduct;

6.  For costs of suit incurred herein; and

7.  For exemplary and punitive damages in an amount to be determined at the time of trial;

8.  For attorney's fees and costs as permitted by applicable law;

9.  For pre-judgment and post-judgment interest at the maximum legal rate; and

10.  For such other and further relief as the Court deems just and proper.


DATED:  October 10, 2025          FROST LLP


By: _____
JOSHUA S. STAMBAUGH
NICO L. BRANCOLINI
WILLIAM H. DANCE
Attorneys for Plaintiff
Mark Bianchi

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues and causes of action triable by a jury.

DATED:  October 10, 2025          FROST LLP

By: _____
JOSHUA S. STAMBAUGH
NICO L. BRANCOLINI
WILLIAM H. DANCE
Attorneys for Plaintiff
Mark Bianchi

COMPLAINT